# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  '22 MJ01976
) 
White Google smartphone )
Seizure No. 20222501000314-02 )
("Target Device 1") )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the    Southern    District of    California   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841 and 846 | Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:
See Attached Affidavit, incorporated herein by reference.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Valdivia*
*Applicant's signature*

Gustavo Valdivia, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
   Telephone    *(specify reliable electronic means)*.

Date: June 2, 2022

*Judge's signature*

City and state: San Diego, California    HON. MICHAEL S. BERG, United States Magistrate Judge
*Printed name and title*

# ATTACHMENT A-1
PROPERTY TO BE SEARCHED

The following property is to be searched:

>  White Google smartphone
>  Seizure No. 20222501000314-02
>  ("**Target Device 1**")

**Target Device 1** is currently in the possession of Homeland Security Investigations, located at 880 Front Street, San Diego 92101.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 13, 2022, up to and including May 13, 2022:

a. tending to indicate efforts to import controlled substances from Mexico into the United States and efforts to distribute controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of controlled substances from Mexico into the United States and to facilitate the distribution of controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of cocaine, or some other federally controlled substance from Mexico into the United States and the distribution of such controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States and the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communication, records, or data involved in the activities describe above;

which are evidence of violations of Title 21, United States Code, Sections 841 and 846.

# AFFIDAVIT

I, Special Agent Gustavo Valdivia, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices (collectively, the "**Target Devices**"):

>  White Google smartphone
>  Seizure No. 20222501000314-02
>  ("**Target Device 1**")

>  White Samsung smartphone
>  Seizure No. 20222501000314-01
>  ("**Target Device 2**")

as further described in Attachment A-1 and A-2, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841, and 846 as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Luz De Luna OLMOS ("OLMOS") and others for conspiring to possess with the intent to distribute five kilograms and more of cocaine, 500 grams and more of methamphetamine, and 400 grams and more of fentanyl within the Southern District of California and other violations of Title 21 United States Code, Sections 841 and 846. The **Target Devices** are currently in the custody of Homeland Security Investigations and located at 880 Front Street, San Diego, CA 92101.

2. The information contained in this affidavit is based upon my training and experience, personal observations, and information obtained from other agents and members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a Special Agent with Homeland Security Investigations

1

(HSI) since July 2017. I am currently assigned to the HSI Office of the Special Agent in Charge, in San Diego, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

4. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation of controlled substances into the United States and the distribution of controlled substances within the United States. Through my training, experience, and interactions with other law enforcement officers experienced in narcotics trafficking investigations, I have gained knowledge of the methods and operational habits of narcotics traffickers, including traffickers attempting to import narcotics into the United States from Mexico at Ports of Entry and traffickers distributing controlled substances within the United States.

5. I am aware that it is common practice for narcotics traffickers to utilize cellular telephones to communicate, coordinate, and share information regarding trafficking activities. It is also common practice for narcotics traffickers to smuggle or arrange for controlled substances to be smuggled into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. Regarding the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently use cellular telephones to communicate with the individual(s) responsible for smuggling the concealed narcotics into the United States. Such communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instruction and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within

the United States.

6. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can, and often do, contain electronic evidence of narcotics trafficking activities, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

   a. tending to indicate efforts to import controlled substances from Mexico into the United States and efforts to distribute controlled substances within the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of controlled substances from Mexico into the United States and to facilitate the distribution of controlled substances within the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in the importation of cocaine, or some other federally controlled substance from Mexico into the United States and the distribution of such controlled substances within the United States;

   d. tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States and the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communication, records, or data involved in the activities describe above.

3

# FACTS SUPPORTING PROBABLE CAUSE

7. The facts set forth in this affidavit describe law enforcement actions taken on May 12, 2022. These actions resulted in the seizure of approximately 800 kilograms of cocaine, approximately 75 kilograms of methamphetamine, and more than 1 kilogram of fentanyl, as described below. All law enforcement action and seizures of controlled substances described within this affidavit occurred within the Southern District of California.

8. On May 25, 2022, a federal grand jury empaneled in the Southern District of California returned a three-count indictment charging violations of Title 21, United States Code, Sections 841 and 846. *See U.S v. Cruz et al.*, No. 22-cr-1169 (S.D. Cal.). OLMOS is one of six defendants charged in count one of that indictment with conspiring to distribute five kilograms and more of cocaine, one of two defendants charged in count two with conspiring to distribute 500 grams and more of methamphetamine, and one of two defendants charged with conspiring to distribute 400 grams and more of fentanyl.

**A. Surveillance of the residence at 620 E. 4th Street and the warehouse at 9986 Via De La Amistad.**

9. On May 12, 2022, law enforcement authorities were surveilling a residence at 620 E. 4th Street ("the residence") in National City, California. The residence had been identified by law enforcement in connection with a seizure of approximately 28 kilograms of cocaine on March 2, 2022.

10. At approximately 11:45 a.m., Luz De Luna OLMOS ("OLMOS") and Vanessa RAMIREZ (RAMIREZ") were observed leaving the residence in a silver Nissan Frontier pickup truck (the "Frontier"). OLMOS and RAMIREZ drove the Frontier to a Harbor Freight store in Chula Vista where they retrieved large cardboard boxes from a dumpster and then put the cardboard boxes into the Frontier. OLMOS and RAMIREZ then entered the Harbor Freight store and purchased wheeled moving carts typically used to move heavy items. OLMOS and RAMIREZ later returned to the residence in the Frontier, removed the cardboard boxes from the Frontier, and carried the cardboard boxes inside the residence.

11. At approximately 1:30 p.m., OLMOS drove the Frontier from the residence to a

nearby Walmart store where she purchased additional cardboard boxes, which she then transported back to the residence.

12. At approximately 3:00 p.m., RAMIREZ drove the Frontier from the residence to a warehouse located at 9986 Via De La Amistad, Unit A in San Diego, California, (the "warehouse"). The warehouse is approximately 300 feet north of the United States / Mexico border and approximately one-half mile from the Otay Mesa Port of Entry. An unknown male waved RAMIREZ into the warehouse and opened the warehouse's roll-up garage door. RAMIREZ then drove the Frontier into the bay of the warehouse and the roll-up door was shut immediately after the Frontier was inside the warehouse.

13. At approximately 4:40 p.m., the warehouse's roll-up garage door was opened, and RAMIREZ exited the warehouse in the Frontier. RAMIREZ then drove the Frontier back to the residence as law enforcement followed her. RAMIREZ parked the Frontier on the street in front of the residence.

14. Within 10 minutes of RAMIREZ departing the warehouse, a white Ford van (the "van") also departed the warehouse and drove directly to the residence. The van arrived at the residence at approximately 5:07 p.m. and parked in the garage of the residence.

**B. Traffic stops resulting in three seizures of multi-kilogram amounts of cocaine from three vehicles seen arriving at the residence and departing after a brief period.**

15. At approximately 5:40 p.m., an individual, later identified as Manuel Perez-Herrera ("PEREZ"), arrived at the residence in a Jeep Cherokee (the "Jeep"). PEREZ parked the Jeep on the street and walked into the residence. PEREZ drove the van out of the garage of the residence and parked the van on the street in front of the residence. PEREZ then drove the Jeep into the garage of the residence at approximately 5:47 p.m. At approximately 5:57 p.m., PEREZ drove the Jeep out of the garage and departed from the residence. Law enforcement then conducted a traffic stop of PEREZ in the Jeep. During the traffic stop PEREZ gave consent to law enforcement to search the Jeep. A search of the Jeep revealed PEREZ was in possession of approximately eight cardboard boxes containing more than 200 wrapped brick-shaped packages filled with a white powdery

substance. A sample of white powder from one of the wrapped packages seized from the Jeep was tested using a TruNarc device and tested positive for the presence of cocaine. Approximately 313 kilograms of wrapped packages containing the white powdery substance were seized from cardboard boxes within the Jeep.

16. At approximately 6:12 p.m., a Toyota Prius (the "Prius") arrived near the garage of the residence while the garage was open. The Prius backed into the garage of the residence and law enforcement observed the hatchback of the Prius open while in the garage. The Prius departed the residence after approximately two minutes and traveled to the parking lot of a nearby market while law enforcement authorities watched. The driver of the Prius, Juan CRUZ ("CRUZ"), was observed speaking with Mario JARAMILLO ("JARAMILLO"). JARAMILLO had arrived at that market parking lot in a gray Toyota Camry (the "Camry"). CRUZ and JARAMILLO began moving large cardboard boxes from the Prius to the Camry. Law enforcement authorities approached CRUZ and JARAMILLO as the two were placing a cardboard box into the Camry. After a K9 alerted to the rear of the Camry, law enforcement searched the Camry and seized approximately two boxes from the Camry containing approximately 55 wrapped brick-shaped packages filled with a white powdery substance. A sample of powder from one of the wrapped packages seized from the Camry was tested using a TruNarc device and tested positive for the presence of cocaine. Approximately 59 kilograms of wrapped packages containing the white powdery substance were seized from carboard boxes that had been transferred from the Prius to the Camry.

17. At approximately 6:25 PM, a blue Chevrolet Captiva (the "Chevrolet") arrived at the residence and drove into the garage. The Chevrolet stayed in the garage for a brief period before exiting the garage and driving away from the residence. Law enforcement authorities followed the Chevrolet and conducted a traffic stop. Law enforcement authorities spoke with the driver, identified as Adrian ENRIQUEZ ("ENRIQUEZ"), and ENRIQUEZ gave consent to search the Chevrolet. Inside the vehicle, law enforcement authorities found approximately five cardboard boxes containing approximately 11

bundles of wrapped packages filled with white powder. A sample of powder from one of the wrapped packages seized from the Chevrolet was tested using a TruNarc device and tested positive for the presence of cocaine. Approximately 125 kilograms of wrapped packages containing that white powdery substance were seized from carboard boxes in the Chevrolet.

18. At approximately 6:35 p.m. law enforcement observed RAMIREZ walking toward the Frontier parked at the curb in front of the residence while OLMOS walked toward the van. Law enforcement made contact and detained both OLMOS and RAMIREZ.

19. RAMIREZ was placed under arrest after being detained and was advised of her *Miranda* rights and agreed to make statements to investigators. RAMIREZ stated that she drove the Frontier to the warehouse and that the Frontier and the van were loaded with boxes while she was at the warehouse. RAMIREZ stated she then drove the Frontier to the residence and the van was driven to the residence by someone she did not know. RAMIREZ stated the boxes containing narcotics that were loaded into the Frontier at the warehouse were still in the Frontier at the time of her arrest. RAMIREZ further stated she rented the residence through Airbnb using her cellular phone.

20. OLMOS was also placed under arrest for narcotics violations. **Target Device 1** was seized at the time of OLMOS' arrest. OLMOS was shown **Target Device 1** during a post-arrest interview and OLMOS identified **Target Device 1** as belonging to her.

**C. Search warrant executed at 620 E. 4th Street resulting in seizures of cocaine, methamphetamine, and fentanyl.**

21. On May 12, 2022, law enforcement obtained and executed a search warrant at the residence. A search of the residence resulted in the seizure of approximately 102 kilograms of white powdery substances from which a sample was taken and determined by a TruNarc device to contain cocaine. Most of those substances were seized from the garage of the residence.

22. **Target Device 2** was seized from a bedroom in the residence during the search warrant. The bedroom in which **Target Device 2** was located also contained documents bearing OLMOS' name.

23. In addition to the residence, law enforcement searched the Frontier at the residence pursuant to the search warrant. A search of the Frontier resulted in the seizure of approximately 204 kilograms of substances from which a sample was taken and determined by a TruNarc device to contain cocaine; approximately 75 kilograms from which a sample was taken and determined by a TruNarc device to contain methamphetamine; and more than one kilogram of substances from which a sample was taken and determined by crime lab analysis to contain fentanyl.

**D. Search warrant executed at 9986 Via De La Amistad and discovery of sophisticated underground cross-border tunnel.**

24. Law enforcement obtained a search warrant for the warehouse on May 12, 2022 and executed the search shortly after midnight on May 13, 2022. A search of the warehouse revealed, among other things, the warehouse was connected to an underground cross-border tunnel into Mexico. In my training and experience, narcotics traffickers utilize such underground cross-border tunnels to import illegal narcotics from Mexico into the United States, among other illegal uses.

25. Based on the facts set forth above, among other facts included within this investigation, there is probable cause to believe that OLMOS and one or more other persons knowingly conspired to distribute five kilograms and more of cocaine, 500 grams and more of methamphetamine, and 400 grams and more of fentanyl.

26. In my experience investigating violations of federal law and drug trafficking crimes, I know that electronic devices such as the **Target Devices** hold substantial evidentiary value. I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the **Target Devices**. Considering the above facts and my experience and training, there is probable cause to believe that OLMOS was using the **Target Devices** to communicate with her co-conspirators regarding the distribution of illicit narcotics within the United States and the Southern District of California. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug distribution event in the days and weeks prior to such an event. Co-conspirators are also

often unaware of a particular co-conspirator's arrest and will continue to attempt to communicate with a co-conspirator after their arrest to determine the whereabouts of the narcotics or the proceeds of such narcotics. Based on my training and experience, it is also common for individuals, such as OLMOS, to attempt to minimize the amount of time they were involved in their illegal trafficking activities, and for individuals such as OLMOS involved in the trafficking of large quantities of narcotics to be so involved for long periods of time. Accordingly, I request permission to search the **Target Devices** for data beginning on April 13, 2022, up to and including May 13, 2022.

## METHODOLOGY

27. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take

weeks or longer.

28. Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

29. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

30. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

31. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of OLMOS' violations of Title 21, United States Code, Sections 841, and 846. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A-1 and A-2, and seize the items listed in Attachment B using the above-described methodology.

//
//
//
//
//
//
//
//

10

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Gustavo Valdivia
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 1st day of June 2022.

_____
Honorable Michael S. Berg
United States Magistrate Judge

11